UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

EXTENDED STAY AMERICA, INC.　　)
and ESA MANAGEMENT LLC,　　　　)
　　　　　　　　　　　　　　　　)
　　　　Plaintiffs,　　　　　　　)
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　)　　Case. No.
　　　　　　　　　　　　　　　　)
WOODSPRING HOTELS LLC,　　　　 )
BERNADETTE RUBY, and MICHAEL　)　　**JURY TRIAL DEMANDED**
DOCTEROFF,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　)

**COMPLAINT AND REQUEST**
**FOR PRELIMINARY AND PERMANENT INJUNCTIONS**

COME NOW Plaintiffs Extended Stay America, Inc. and ESA Management LLC (collectively, "ESA") and for their cause of action for injunctive and other relief against Defendants WoodSpring Hotels LLC ("WoodSpring"), Bernadette Ruby, and Michael Docteroff, state as follows.

This action arises out of Defendants' theft and misuse of ESA's competitively sensitive trade secret information, concerning tens of thousands of ESA customer accounts (broken down by specific geographic markets) that represent tens of millions of dollars in ESA business, to compete unfairly with ESA.

**PARTIES**

1.　　　　Extended Stay America, Inc. is a Delaware corporation with its principal place of business in Charlotte, North Carolina.

2.　　　　ESA Management LLC is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina.  ESA Management LLC is a wholly owned

subsidiary of Extended Stay America, Inc. and provides management services to Extended Stay America, Inc.'s subsidiaries and affiliates.

3.     WoodSpring Hotels LLC is a Delaware limited liability company with a principal place of business in Wichita, Kansas.

4.     Bernadette Ruby is an individual residing in Wichita, Kansas.

5.     Michael Docteroff is an individual residing in Caldwell, New Jersey.

## JURISDICTION AND VENUE

6.     The Court has jurisdiction over ESA's Defend Trade Secrets Act and Computer Fraud and Abuse Act claims pursuant to 28 U.S.C. § 1331.   The Court may exercise supplemental jurisdiction over ESA's state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution.

7.     The Court has personal jurisdiction over WoodSpring because it maintains its principal place of business in Kansas.

8.     The Court has personal jurisdiction over Ruby because she resides in Kansas.

9.     The Court has personal jurisdiction over Docteroff pursuant to Fed. R. Civ. P. 4(k)(1)(A) and Kan. Stat. Ann. § 60-308(b) because Docteroff committed tortious acts within Kansas—to wit, disclosing ESA's trade secrets to individuals located in Kansas—and those acts give rise to ESA's claims for relief.

10.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because this is a judicial district in which a substantial part of the events giving rise to ESA's claims occurred.

## THE EXTENDED-STAY LODGING BUSINESS

11.     ESA and WoodSpring are competitors in the extended-stay lodging business. Unlike transient, leisure-oriented hotels—which typically consist of a bedroom and bathroom and cater to short-term guests—extended-stay hotels are designed for guests who stay five nights or longer.   Extended-stay hotels typically have kitchens with cooking equipment and refrigerators.   Approximately 69% of ESA's total revenues come from guests who stay five nights or longer; 43% of its revenues come from guests who stay longer than 30 nights.

12.     The extended-stay lodging market is generally divided into "upscale," "midscale" and "economy" segments.  Brands in the upscale segment charge the highest room rates, brands in the economy segment charge the lowest room rates, and brands in the midscale segment charge rates in between.

13.     Typical extended-stay brands in the upscale segment are Residence Inn by Marriott and Homewood Suites by Hilton.   Typical extended-stay brands in the midscale segment are TownePlace Suites by Marriott, Home2 Suites by Hilton, Candlewood Suites, and Hawthorn Suites by Wyndham.

14.     ESA is the largest and most dominant brand in the extended-stay market. Founded in 1995, ESA has 629 hotels and over 69,000 guest rooms in the United States and Canada and over $1.2 billion in annual revenues.  ESA has more than twice as many properties as its next-closest competitor and almost as many guest rooms as its next three closest competitors combined.  Unlike its competitors, ESA owns and operates all of its properties; none are franchised to third parties.   From a pricing perspective, ESA occupies a unique niche between its midscale and economy competitors, with a significant pricing gap on either side.

15.     WoodSpring was founded in 2003.  For most of its existence, WoodSpring was known as "Value Place," and operated under that brand name in the economy extended-stay segment.  In January 2015, it described itself as "the nation's largest economy extended-stay hotel brand with nearly 200 hotels located in 32 states," of which it owned 82 and franchised the rest.

**IN 2015, WOODSPRING ENTERED THE UNIQUE SEGMENT OF
THE EXTENDED-STAY LODGING MARKET DOMINATED BY ESA**

16.     On April 23, 2015, WoodSpring announced that it was changing its name from Value Place "to WoodSpring Suites, effective immediately," and that it was launching a new brand extension "to appeal to less price sensitive guests."  In its press release announcing the change, the company's President and Chief Operating Officer stated that after "an enormous amount of consumer research," the company "found that although consumers and developers actually love the Value Place product offering, there is a disconnect between perceptions of who we are and the reality of our product and experience based on our current branding," and that the branding change would "allow us to expand our reach to new customer segments."  WoodSpring now describes itself as "the company behind the nation's fastest growing value extended-stay hotel brand with more than 210 hotels system-wide located in over 30 states. The company owns 90 hotels and provides management services for both company-owned and franchised locations under the WoodSpring Suites and Value Place brands."  Many current WoodSpring Suites hotels have been converted from the Value Place brand.

17.     With its upward repositioning and launch of the WoodSpring Suites and WoodSpring Signature (a new product focusing on business travelers) brands, WoodSpring has attempted to put itself into direct competition with ESA.

### OVER THE COURSE OF MANY YEARS, ESA HAS MADE
### SIGNIIFICANT INVESTMENTS IN ITS CORPORATE SALES BUSINESS

18.     Extended-stay guests have different needs, and come from different sources, than other hotel guests.  Many are individuals who book their own travel on their own account; typical examples are students, medical patients and their families, construction workers, families in transition, and others who need to stay in a given location for an extended period of time. Others work for companies who make travel arrangements on their behalf; typical examples are consulting firms, IT contractors, relocation and staffing firms, medical, technology, government and educational organizations, and other companies that either provide or require services that span weeks or months.  Business booked by companies is generally more valuable than business booked by individuals; companies pay higher rates, book multiple rooms at a time, and are a better source of repeat business than individual extended-stay travelers.

19.     In or about 2012, ESA began a strategic effort to shift more of its business from long-term residential guests to this more valuable corporate business.  The shift coincided with a massive renovation of ESA's entire hotel portfolio, which improved the quality and guest experience of ESA's hotels and allowed it to pursue this higher-rated business.  Since 2012, ESA has spent approximately $570 million renovating its hotels, a program that will conclude in early 2017.

20.     Simply renovating its hotels, however, would not be sufficient to bring in new corporate business.  To pursue that business, ESA had to dramatically increase the size and effectiveness of its sales organization to specifically target corporate accounts.  From 2012 through 2015, ESA increased the size of its sales organization from 120 to over 160 persons. ESA also invested in a new sales system, market research and business intelligence tools to identify target corporate accounts to bring in new business to each market as part of a detailed

sales and marketing plan for the hotel renovations.  Over that period, the amount of business booked by ESA's sales organization increased by 35%, and its corporate sales now comprise over 45% of ESA's total revenues.

**SHORTLY AFTER ENTERING A NEW SEGMENT OF THE EXTENDED-STAY MARKET IN DIRECT COMPETITION WITH ESA, WOODSPRING HIRED DEFENDANT RUBY, ESA'S FORMER VICE PRESIDENT OF SALES OPERATIONS**

21.     When WoodSpring announced in April 2015 that it was rebranding itself from Value Place and moving upscale, it lacked the time, resources, or willingness to make the same investments that ESA made.  Instead, it chose to hire a former ESA sales executive and, through her, steal the fruit of those investments from ESA.

22.     Defendant Bernadette Ruby was hired by ESA's corporate predecessor, Homestead Village Inc., as Area Sales Manager for Northern California in or about August of 2001.  She was eventually was promoted to Vice President of Sales Operations.

23.     As ESA's Vice President of Sales Operations, Ruby was responsible for developing and executing sales strategies, processes and systems.  Ruby oversaw sales and business development by ESA's sales teams and reported their performance to senior management.  As a result of her position with ESA, she was given access to and detailed knowledge of ESA's sales and marketing operations, including ESA's trade secrets and its other confidential and proprietary information.  Ruby had direct contact with ESA's customers and potential customers.

24.     ESA had numerous confidentiality policies and procedures (outlined below) in place during the time that Ruby was employed by ESA.  Ruby was expected to comply with ESA's policies and procedures, and from time to time was asked to read and acknowledge receipt of ESA's policies.

25.     During her employment with ESA, and in her role as Vice President of Sales Operations, Ruby worked regularly with Defendant Docteroff to access and work with extensive information maintained by ESA in its secure databases.

26.     As a result of her responsibilities at ESA, Ruby was highly compensated by ESA.

27.     By late 2014, Ruby's relationship with ESA had deteriorated as a result of her inadequate job performance.

28.     On November 19, 2014, Ruby received a Performance Improvement Plan ("PIP") from ESA subjecting her to close supervision by her leadership team.  The PIP identified a number of deficiencies in Ruby's performance, including but not limited to: substandard financial metrics and reporting, poor or non-existent communication, failure to properly supervise subordinates, inaccurate and low-quality work, numerous broken commitments, intentional dishonesty, willful misconduct, and insubordination.  Performance reviews from this time period documented a number of other deficiencies in Ruby's work, including inappropriate handling of confidential information.

29.     In or about January of 2015, ESA and Ruby terminated their employment relationship by entering into a Separation Agreement and Release ("SAR").  (The SAR contains a scrivener's error, stating that the parties were terminating their employment relationship on January 16, 2014; the actual date was January 16, 2015.)  The SAR contained several confidentiality and non-compete provisions.

30.     Section 7 of the SAR provides:

> All records, files, lists, including computer generated lists, drawings, notes, notebooks, letters, handbooks, blueprints, manuals, sketches, specifications, formulas, financial documents, sales and business plans, customer lists, lists of customer contacts, pricing information, . . . and similar items relating to the Company's business, . . . shall be returned to the Company upon

the Termination Date.  Employee further represents that Employee has not and will not copy or cause to be copied, print out or cause to be printed out any software, documents or other materials originating with or belonging to the Company.

31.     Section 8 of the SAR provides:

Employee agrees that information that is not generally known to the public to which Employee has been exposed as a result of Employee being employed by the Company is Confidential Information that belongs to the Company.  This includes information developed by Employee, alone or with others, or entrusted to the Company by others.  Employee will hold the Company's Confidential Information in strict confidence, and not disclose or use it except as authorized by the Company and for the Company's benefit. . . .

32.     The SAR defines Confidential Information to include:

[T]rade secrets; personnel and compensation information; accounts and account information; procedures; manuals; financial cost and sales data; supply sources and resources; contracts; pricing; accounting and bookkeeping practices; office policies and practices; financial information; marketing strategy and plans; business plans; prospect names and lists; existing and potential business opportunities; confidential reports; customer names, contact information, needs, purchase history and related information; policies and contracts; and litigation and other legal matters.

33.     Section 9 of the SAR prohibited Ruby, for a period of six months following her termination, from engaging in the following activities: soliciting away from ESA the business of customers with whom Ruby or her direct reports had personal contact in the preceding year; entering the employment of a direct competitor; intentionally interfering with the business relationships of ESA; and soliciting ESA employees to leave ESA.

34.     In connection with the SAR, ESA paid Ruby a total of $71,442.48.

35.     In or about July of 2015, three months after WoodSpring announced its rebranding and repositioning and immediately after the non-competition and non-solicitation provisions in the SAR expired, WoodSpring hired Ruby as its Vice President of Sales.

36.     Ruby's job duties in her position as Vice President of Sales for WoodSpring are nearly identical to those she performed on behalf of ESA.

37.     In addition to Ruby, WoodSpring and its franchisees have hired at least a dozen other former ESA, including five in vice president, senior vice president, and executive vice president positions.

38.     Hiring Ruby and other former ESA employees by itself would not be illegal, so long as those employees honored their various contractual and other legal obligations of confidentiality.   However, Ruby has also obtained and is distributing confidential and competitively sensitive ESA information to WoodSpring's sales team in order to steal customers from ESA to grow WoodSpring's business.

## ESA'S TRADE SECRETS

39.     In order to manage its half-billion-dollar portfolio of corporate sales business, ESA maintains a database of detailed information concerning its corporate customers (the "Trade Secrets").  The database includes extensive customer and market-specific information, including (1) customer lists and contact information; (2) the identities of prospective customers; and (3) pricing and other detailed information associated with its customers by geographic market, including but not limited to: the rates offered to individual ESA customers by geographic market, the number of nights each customer purchases in a particular geographic market, and the total revenue derived from each customer in each of ESA's geographic markets.  The Trade Secrets

include information about tens of thousands of corporate customers that ESA has identified and cultivated over the course of nearly two decades.

40.     Defendant Michael Docteroff has provided IT consulting services to ESA since approximately 2005.  Docteroff has been on a full-time contract retainer with ESA since that time.

41.     Docteroff originally provided services to ESA through NDS, an IT consulting firm.  NDS was later purchased by Edgewater Technology (Delaware) Inc. ("Edgewater").  Docteroff continued to provide consulting services to ESA after the acquisition.

42.     Docteroff was and remains the only full-time ESA IT resource providing general business intelligence analytics and reporting support.

43.     Docteroff's initial project involved the creation of centralized reporting databases from data pulled from each of ESA's property management systems.

44.     Since 2005, Docteroff's services to ESA have included: data and database architecture and design; data preparation and transformation; setting up automated computer processing jobs for routine data updates and aggregation; reporting database tuning and administration; working with IT Management and Business End Users to define and document new reporting/analytics request requirements; developing and enhancing databases, data cubes and reports using a variety of tools; and diagnosing and repairing failed data processing.

45.     As a result of his long tenure and extensive services, Docteroff has extensive knowledge of ESA's computer systems and databases, including the Trade Secrets.

46.     Recently, ESA has undertaken to hire and develop internal talent to provide the services heretofore provided by Docteroff at a lower cost to ESA.   As a result, most of

Docteroff's previous responsibilities are being transitioned to ESA employees.  Since July of 2016, Docteroff's services have been reduced to approximately 8 to 10 hours per month.

47.     Docteroff has been highly compensated for the services that he provided to ESA.

### DEFENDANTS STEAL ESA'S TRADE SECRETS AS PART OF A SCHEME TO DIVERT CUSTOMERS FROM ESA AND EXPAND WOODSPRING'S MARKET SHARE

48.     On or about August 26, 2016, Ruby provided all members of the WoodSpring sales team a document Ruby described as an "ESA sales spreadsheet."

49.     Ruby instructed all members of the WoodSpring sales team to use the information contained in the spreadsheet to focus their efforts exclusively on diverting ESA accounts to WoodSpring.  Ruby offered all of the WoodSpring sales team members a bonus for any business diverted from ESA to WoodSpring.

50.     On August 29, 2016, Ruby sent an e-mail to the WoodSpring sales team concerning a recent team meeting, in which she documented that members of the sales team were looking for a higher bonus "for capturing accounts that are on the new list."  Ruby's e-mail further stated:

> I plan to create a stand alone bonus plan that would be in effect
> Sept-Dec that will not be tied to your annual bonus plan results.
> This will address specifically what each of you can do to move this
> list from the ESA column to the WH column.

51.     Since the ESA information was distributed to WoodSpring sales team members, they have focused their efforts exclusively on diverting ESA business to WoodSpring.

52.     The "ESA sales spreadsheet" that Ruby distributed to members of the WoodSpring sales team is a Microsoft Excel document with the name "Eagle by market.xlsx" (the "Eagle Spreadsheet").  The Eagle Spreadsheet is not a document that would routinely be created and maintained on ESA's computer systems.  Rather, it is a document that was

specifically created by someone with extensive knowledge of ESA's computer systems through querying ESA's internal Trade Secrets database.

53.     Likewise, the Eagle Spreadsheet does not contain all of the customer information contained in the Trade Secrets database.  Rather, the Eagle Spreadsheet consists of a subset of that information, specifically identifying those customers who have stayed with ESA in markets where WoodSpring has competing properties or expects to open a competing property in the near future.

54.     Specifically, the Eagle Spreadsheet contains detailed information concerning thousands of ESA customers, the geographic markets where those customers do business, the number of nights each customer purchased in a specific geographic market, and the total revenue ESA generated from each customer.  The Eagle Spreadsheet contains details on more than 18,000 ESA accounts across 90 different geographic markets, representing more than $47,000,000 in ESA business.  This information allows WoodSpring to easily identify ESA's largest customers, ascertain the rates ESA offers to each customer, and determine which customers to target in a specific geographic market, and at what price.

55.     Only six individuals who worked for or provided consulting services to ESA had the technical knowledge to create the Eagle Spreadsheet.  Docteroff was one of those six individuals.

56.     The Eagle Spreadsheet was created on August 24, 2016 by Docteroff.

57.      Using the Eagle Spreadsheet, WoodSpring sales team members specifically target ESA customers that maintain business with ESA at locations in close proximity to WoodSpring properties and that can easily be relocated.

58.     By misappropriating ESA's Trade Secrets, Ruby and WoodSpring are able to unfairly compete against ESA and divert ESA's customers to WoodSpring.

59.     Since distributing the Eagle Spreadsheet to the WoodSpring sales team, Ruby has made reference to having received a second and updated spreadsheet containing ESA account information from her source within ESA.  Accordingly, there is a substantial possibility that the Eagle Spreadsheet is just the tip of the iceberg, and that Defendants have misappropriated and are in possession of even more of ESA's Trade Secrets, representing significantly more than the $47,000,000 in revenue reflected in the Eagle Spreadsheet.

60.     Ruby has told the members of WoodSpring's sales team to closely guard and keep secret their possession of the Eagle Spreadsheet because she does not want her source within ESA to be found out and punished.

61.     Members of the WoodSpring sales team are concerned that their use of ESA's Trade Secrets and other confidential information is unethical and illegal and have communicated their concerns regarding the use of ESA's Trade Secrets and other confidential information to senior WoodSpring executives, including the WoodSpring Human Resources department and the Vice President of Operations.  Despite being made aware of Ruby's distribution and use of confidential ESA data, WoodSpring executives have not stopped Ruby from misappropriating and using ESA's confidential information.

62.     Indeed, Ruby has continued to distribute ESA's Trade Secrets and confidential information to WoodSpring sales team members.  Specifically, Ruby has been distributing handwritten notes to the WoodSpring sales team containing information from the updated spreadsheet so that they may continue diverting business from ESA.  The customers listed on these handwritten notes correspond to entries on the Eagle Spreadsheet.

## ESA'S PROTECTION OF ITS TRADE SECRETS

63.     Because of the importance of ESA's Trade Secrets and other confidential information to ESA's continued growth and success, ESA has instituted numerous policies to safeguard their secrecy.

64.     For example, ESA has adopted an Associate Handbook.  Numerous provisions of the Associate Handbook require ESA employees to maintain the secrecy and strict confidentiality of ESA's Trade Secrets and other proprietary information, and to take measures to safeguard the security of such information.  Among other things, the Associate Handbook provides:

   a.     No use of any ESA trademark or other intellectual property shall be granted to a third party outside of ESA except pursuant to a written use agreement in accordance with ESA's policies.  Unless expressly approved by a separate ESA policy, all of ESA's assets should be used solely for ESA business purposes only.  None of ESA's assets, funds, facilities, personnel, or other resources should be used for personal purposes unless authorized under a separate ESA policy or otherwise approved by the Chief Legal Officer.

   b.     ESA's associates are exposed to confidential or proprietary information about ESA, its customers, suppliers, or joint venture parties.  The confidentiality of all such information shall be strictly maintained, except when disclosure is authorized or legally mandated.  Confidential or proprietary information includes non-public information about ESA or information that would be harmful to ESA or its customers, suppliers or joint venture parties if disclosed.  All information about ESA, its business, stockholders, customers, suppliers or joint venture parties should be considered confidential, including, but not limited to, confidential technology, proprietary information, trade secrets, business plans, documents, pricing and business records.  Associates should not, without the prior written authorization from the appropriate authority, acquire, use, access, copy, remove, modify, alter or disclose to any third parties, any confidential information for any purpose other than to perform their job responsibilities.  All confidential information must be returned to ESA prior to an Associate leaving ESA.

   c.     No Company equipment or records including but not limited to: storage devices (CD, disks, thumb drives, computer hard drive, etc.), software,

> reports, Guest (or customer/vendor) related information, Associate information, tools, or other equipment, etc. may be removed from the premises or used for reasons other than Company business purposes without the express permission of the Manager.

> d.    Associates are responsible to ensure the availability and security of their portable equipment at all times. Devices that are capable of storing Company and customer data – such as laptops, notebooks, smartphones and thumb drives – must be password protected and, if feasible and practical, encrypted, and smartphones must be set so as to delete messages as they are being deleted on the Company email server in accordance with the Company's email destruction policy. Sensitive information of the Company shall not be kept on mobile devices at all unless such storage meets a particular short-term business need. These devices may not be used for long-term storage of Company or customer data. As soon as practical, all Company and customer data must be transferred to the appropriate storage repository within the Company's electronic environment.

> e.    The Company's Confidentiality Policy restricts Associates' use and disclosure of the Company's confidential information and intellectual property. Beyond these mandatory restrictions, you should treat the Company's valuable trade secrets and other confidential information and intellectual property accordingly and not do anything to jeopardize them through your use of social media. Trade secrets may include information related to the Company's strategies, guest lists, pricing, development of systems, products, know-how, technology, financial records, internal reports and other internal, confidential communications.

65.    ESA's Trade Secrets generally are not available to third parties outside of ESA, nor can they be accessed without direct access to ESA's computer system or on-site files.

66.    ESA requires employees, contractors, consultants, and third-party vendors who have accounts or passwords on any computer system at any ESA facility to comply with ESA's Password Policy. ESA distributes a copy of its Password Policy to all such individuals who have access to ESA's information assets. Passwords to ESA's network expire and must be changed every 90 days. ESA requires individuals with accounts or passwords on ESA's computer systems to use a different password for their ESA accounts than they use for non-ESA accounts. ESA also prohibits individuals with access to its computer systems from using their ESA

passwords for cloud applications.  Where possible, individuals with access to ESA's computer systems must use a different password for each ESA account.  Individuals with access to ESA's computer systems are forbidden from sharing their passwords with anyone.

67.    ESA also distributes Password Guidelines requiring individuals with access to ESA computer systems to use strong passwords consisting of at least 8—and preferably at least 15—characters.  The Password Guidelines provide guidance on how to create strong passwords and identify various forms of weak passwords that should be avoided.

68.    System administrators and individuals with system-level access are required to take additional steps to protect the secrecy of their ESA passwords.  Such individuals are required to change their passwords on at least a quarterly basis.  Individuals with system-level access must have a unique password from all other accounts held by that user.  Moreover, such individuals must use two-factor authentication, which provides an additional layer of security for ESA's most confidential and secure information assets.

69.    In addition to strict password and authentication requirements, ESA also limits access to confidential information to those with a need to know or access such information.  ESA has an Access Control Policy which is distributed to individuals with access to ESA's information assets.  The Access Control Policy governs access to confidential ESA information.  Pursuant to the policy, access to confidential ESA information is determined by job function and executive management.  Moreover, access to computer systems containing confidential information is tracked to identify who accesses such systems and when.  These systems are audited on a semi-annual basis.  Any hard copy materials and electronic media containing confidential information are protected by appropriate physical access controls.

70.     ESA has also instituted certain technical safeguards for its confidential information.   For example, ESA has an Encryption Policy that applies and is distributed to individuals with access to ESA's information assets.   The policy requires that all of ESA's confidential information be encrypted, both when in transmission and at rest.   The policy prohibits sending unencrypted confidential information through e-mail or messaging technology. The policy prohibits sending even encrypted confidential information through email unless there is a valid business purpose for such transmission and it has been approved by the Manager of Technology Risk and Security, or the Chief Information Officer.   The policy limits approved encryption methods to those that have received substantial public review and have proved to work effectively.

71.     Furthermore, ESA provides its employees with access to ESA confidential information with guidance regarding proper handling of that information.   ESA's Acceptable Use Policy applies and is distributed to individuals with access to ESA's information assets.   The policy defines the acceptable uses of those information assets.   The Acceptable Use Policy provides that ESA's information assets are provided for business uses only, and any information created on ESA's corporate systems remains the property of ESA.   Under the policy, ESA's computer equipment, systems and network traffic are regularly monitored.   The policy requires that all computers, laptops and workstations be secured with a password-protected screensaver that activates within at most 15 minutes of inactivity.   All users are required to log out of their workstations before leaving them unattended.

72.     The Acceptable Use Policy strictly prohibits those with access to ESA's information assets from engaging in any activity illegal under local, state, federal or international law.   It further prohibits engaging in any activity that violates the rights of any person under

copyright, trade secret, patent or other intellectual property law.   The policy also prohibits accessing data of which the individual is not the intended recipient or is not expressly authorized to access.

73.     Upon termination of an employee's or vendor's relationship with ESA, the employee or vendor's access to ESA's computer systems is immediately terminated.   Indeed, ESA has in place specific policies and procedures requiring the termination of access to ESA's computer systems and information assets for terminated employees and vendors.

74.     ESA also has in place measures to prevent unauthorized access to physical copies of its confidential information and Trade Secrets.   ESA's Badge Access Policy limits access to ESA's physical facilities to individuals who have an ESA identification badge.   Employees must immediately report a lost or stolen badge and must return their identification badge upon termination.   Contractors and temporary employees with assignments lasting longer than two weeks are also issued badges.   Those badges, however, grant only basic access.   Individuals with assignments lasting less than two weeks must be escorted through ESA's premises.   Access to secured areas is addressed on a case-by-case basis.

75.     Any individual who violates any of the foregoing policies is subject to discipline, up to and including termination.

76.     Because he had been given knowledge of and access to ESA's computer systems and some of ESA's most valuable assets, Docteroff was subject to and made aware of all of these confidentiality policies.   In addition, because he typically worked remotely, Docteroff usually accessed ESA's computer systems through his laptop by way of VPN using two-factor authentication.

77.     Moreover, ESA is a party to a Master Services Agreement ("MSA") between Edgewater and an ESA predecessor-in-interest, which requires Edgewater and its employees, including Docteroff, to maintain the confidentiality of ESA's data.

78. Section 15 of the MSA provides:

> Edgewater and [ESA] acknowledge that each may come into the possession of information of the other relating to each party's employees, customers, operations, activities, products and/or services, that such information is property valuable to the party which has developed it, and that the party which has developed it desires to retain it in confidence and withhold it from publication to others.  Edgewater and [ESA] therefore agree that any and all such confidential information of the other, and any information or knowledge which may be imparted solely through receipt and examination of confidential information of the other, will not be copied or communicated to any third party, or used by a party, its employees, servants or agents except as may be necessary for fulfilling the terms of this Agreement or upon prior written approval of the other party.  Edgewater and [ESA] agree to return all written or other tangible confidential information of the other, including all extracts and copies thereof, upon the other's request or to dispose of such confidential information in accordance with the other's written instructions.

**DEFENDANTS' THEFT AND MISUSE OF ESA'S TRADE SECRETS IS CAUSING AND WILL CONTINUE TO CAUSE SERIOUS AND IRREPARABLE HARM TO ESA**

79.     WoodSpring and Ruby's possession and use of ESA's Trade Secrets and other confidential information represents a significant threat to ESA's business.

80.     As described above, the Trade Secrets reflect the considerable time and money that ESA has invested in identifying and building relationships with its customers, which are uniquely valuable in the extended-stay business, and collecting and maintaining extensive information about those relationships.

81.     As a result of these efforts and through maintaining the secrecy of its Trade Secrets and confidential information, ESA enjoys a significant competitive advantage over others who seek to offer extended-stay lodging accommodations, including WoodSpring.

82.     By misappropriating this information, WoodSpring and Ruby are able to free-ride on ESA's research and marketing efforts, thereby avoiding the substantial costs of developing their own customer base as they enter and attempt to grow WoodSpring's share of the market space in which ESA operates.   Through these costs savings, WoodSpring is able to unfairly target ESA's customers and undercut ESA's prices in ways that would be impossible if it were not in possession of ESA's Trade Secrets and confidential information.

83.     Defendants' possession and use of this information threatens the continued secrecy and protection of ESA's Trade Secrets.   By removing this information from ESA's secured computer systems and freely distributing it to WoodSpring employees, there is a substantial threat that ESA's information will come into the possession of others able to make economic use if it, such as WoodSpring franchisees and other ESA competitors.

84.     Defendants' possession of this information also enables them to unfairly compete with ESA and divert customers that are critical to a large portion of ESA's overall revenue.

85.     These threats to ESA's business cannot be remedied solely by monetary damages. The continued misappropriation, possession, use, and distribution of ESA's Trade Secrets and other confidential information will have long-term impacts on ESA's business and competitive edge that are difficult or impossible to measure.   The loss of the competitive advantage that ESA has heretofore enjoyed as a direct result of its marketing success cannot be fully restored by an award of damages.

**COUNT I**
**VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT ("DTSA") – ALL**
**DEFENDANTS**

86.     ESA repeats and realleges the foregoing paragraphs as if fully set forth herein.

87.     ESA's Trade Secrets are compilations of business information that derive actual, independent commercial value from not being generally known or readily ascertainable through proper means by others who can obtain economic value from their disclosure or use.

88.     ESA employs reasonable measures to maintain the secrecy of its Trade Secrets, including but not limited to requiring ESA's employees and contractors (including Ruby and Docteroff) to adhere to ESA's confidentiality policies, limiting access to employees and contractors with a legitimate business reason for knowing or accessing such information, and maintaining physical, electronic, and procedural safeguards.

89.     ESA's Trade Secrets relate to a product or service used interstate commerce.

90.     Docteroff misappropriated ESA's Trade Secrets by disclosing them to Ruby and WoodSpring without ESA's express or implied consent and knowing that he had acquired the Trade Secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use.

91.     Ruby and WoodSpring misappropriated ESA's Trade Secrets by acquiring and using them without ESA's express or implied consent and knowing or having reason to know that Docteroff had acquired the Trade Secrets while under a duty to maintain their secrecy and limit their use.

92.     Defendants' actions constitute actual or threatened misappropriation of trade secrets in violation of the DTSA, 18 U.S.C. §§ 1836 and 1839.

93.     Ruby acted within the scope of her employment with WoodSpring and in furtherance of WoodSpring's business, and WoodSpring is liable for Ruby's misappropriation of ESA's Trade Secrets, which she is using for WoodSpring's benefit and with its knowledge.

94.     Defendants' misappropriation of ESA's Trade Secrets was willful and malicious.

95.     Defendants' misappropriation of ESA's Trade Secrets has caused substantial and irreparable damage to ESA by giving Ruby and/or WoodSpring an unfair competitive advantage over ESA and placing them in a position to divert substantial business from ESA.

96.     Unless Defendants are preliminarily and permanently enjoined from committing and continuing to commit the foregoing conduct, they will continue to threaten ESA's business, and ESA will suffer immediate, substantial, and irreparable harm from the aforesaid actions.

97.     Through the factual allegations contained herein, ESA has established a substantial likelihood of success on the merits, that it has no adequate remedy at law, and that the balance of equities favors entry of an injunction against Defendants.

98.     In addition to the irreparable injury caused by Defendants' actions, Defendants' misappropriation has caused ESA economic damages in an amount to be proved at trial.

99.     In addition, Defendants' willful and malicious misappropriation entitles ESA to punitive damages.  18 U.S.C. § 1836(b)(3).

## COUNT II
## VIOLATION OF THE NORTH CAROLINA TRADE SECRETS PROTECTION ACT AND KANSAS UNIFORM TRADE SECRETS ACT– ALL DEFENDANTS

100.     ESA repeats and realleges the foregoing paragraphs as if fully set forth herein.

101.     ESA's Trade Secrets are compilations of business information that derive actual, independent commercial value from not being generally known or readily ascertainable to other

persons who can obtain economic value from their disclosure or use, or through independent development or reverse engineering.

102.    ESA undertakes significant effort, which is reasonable under the circumstances, to maintain the secrecy of its Trade Secrets, including but not limited to requiring ESA's employees and contractors (including Ruby and Docteroff) to adhere to ESA's confidentiality policies, limiting access to employees and contractors with a legitimate business reason for knowing or accessing such information, and maintaining physical, electronic, and procedural safeguards.

103.    Ruby and WoodSpring misappropriated ESA's Trade Secrets by acquiring and using them, without ESA's express or implied authority or consent, after obtaining them from Docteroff, who did not have the right to disclose the Trade Secrets.

104.    Docteroff misappropriated ESA's Trade Secrets by disclosing them to Ruby and WoodSpring without ESA's express or implied authority or consent and knowing that he had acquired the information under circumstances giving rise to a duty to maintain its secrecy or limit its use.

105.    Defendants knew of ESA's customer lists and pricing information and knew or should have known they constituted trade secrets.

106.    Defendants had specific opportunity to—and in fact did—acquire, disclose and use ESA's Trade Secrets without ESA's express or implied consent or authority.

107.    Defendants' actions constitute actual or threatened misappropriation of trade secrets in violation of the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152, *et seq.* and the Kansas Uniform Trade Secrets Act, Kan. Stat. Ann. § 60-3320, *et seq.*

108.    Ruby acted within the scope of her employment with WoodSpring and in furtherance of WoodSpring's business, and WoodSpring is liable for Ruby's misappropriation of ESA's Trade Secrets, which she is using for WoodSpring's benefit and with its knowledge.

109.    Defendants' misappropriation of ESA's Trade Secrets was willful and malicious.

110.    Defendants' misappropriation of ESA's Trade Secrets has caused substantial and irreparable damage to ESA by giving Ruby and/or WoodSpring an unfair competitive advantage over ESA and placing them in a position to divert substantial business from ESA.

111.    Unless Defendants are preliminarily and permanently enjoined from committing and continuing to commit the foregoing conduct, they will continue to threaten ESA's business, and ESA will suffer immediate, substantial, and irreparable harm from the aforesaid actions.

112.    Through the factual allegations contained herein, ESA has established a substantial likelihood of success on the merits, that it has no adequate remedy at law, and that the balance of equities favors entry of an injunction against Defendants.

113.    In addition to the irreparable injury caused by Defendants' actions, Defendants' misappropriation has caused ESA economic damages in an amount to be proved at trial.

114.    In addition, Defendants' willful and malicious misappropriation entitles ESA to punitive damages.  N.C. Gen. Stat. § 66-154.

**COUNT III**
**BREACH OF CONTRACT – BERNADETTE RUBY**

115.    ESA repeats and realleges the foregoing paragraphs as if fully set forth herein.

116.    The SAR is a valid and enforceable contract between ESA and Ruby.

117.    Ruby breached Section 7 of the SAR by copying and/or causing to be copied ESA's Trade Secrets and other confidential and proprietary information, which she has disclosed, divulged, and shared with WoodSpring and its employees.

24

118.     Ruby breached Section 8 of the SAR by disclosing, divulging, and sharing with WoodSpring and its employees Trade Secrets and confidential information belonging to ESA, and by encouraging WoodSpring employees to use that information to solicit ESA's customers.

119.     Through the actions set forth herein, Ruby has given ESA reasonable cause to believe additional breaches of the SAR are imminent.

120.     By virtue of the foregoing events and actions undertaken by Ruby detailed herein, Ruby and/or WoodSpring are able to unfairly compete with ESA and are in a position to divert substantial business from ESA.  Accordingly, Ruby has caused, and will cause in the future, substantial and irreparable harm to ESA, its business and operations, through the violation and continued breach of the SAR.

121.     Unless Ruby is preliminarily and permanently enjoined from committing and continuing to commit the foregoing conduct, she will continue to threaten ESA's business, and ESA will suffer immediate, substantial, and irreparable harm from the aforesaid actions.

122.     Through the factual allegations contained herein, ESA has established a substantial likelihood of success on the merits, that it has no adequate remedy at law, and that the balance of equities favors entry of an injunction against Ruby.

123.     In addition to the irreparable harm described above, Ruby's breach of contract has caused ESA to suffer economic injuries in an amount to be proved at trial.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY – BERNADETTE RUBY**

124.     ESA repeats and realleges the foregoing paragraphs as if fully set forth herein.

125.     As an employee and executive officer of ESA Management LLC, Ruby owed ESA Management LLC a duty of loyalty and was obligated to act in good faith and in the best interests of the company.

126.    Ruby's fiduciary duty included an obligation to safeguard the secrecy of ESA's Trade Secrets and other confidential and propriety information, and not to use that information to advance her own interests or those of ESA's competitors.   That duty was reinforced by the numerous confidentiality policies Ruby was required to acknowledge during her employment.

127.    Ruby's duty to maintain the secrecy of ESA's Trade Secrets and other confidential and proprietary information, and not to use that information to compete with ESA, extend beyond the duration of her employment with ESA Management LLC, as memorialized by the terms of the SAR.

128.    Ruby has willfully and maliciously breached, and continues to breach, her fiduciary obligations by retaining confidential and proprietary information belonging to ESA; distributing such information to WoodSpring and its employees; and using that information, in concert with others, to unfairly and unlawfully compete with and divert business from ESA.

129.    Ruby's breaches of her fiduciary obligations were willful and malicious.

130.    By virtue of the foregoing events and actions undertaken by Ruby detailed herein, Ruby and/or WoodSpring are able to unfairly compete with ESA and are in a position to divert substantial business from ESA.   Accordingly, Ruby has caused, and will cause in the future, substantial and irreparable harm to ESA, its business and operations, through the violation and continued breach of the duty of loyalty.

131.    Unless Ruby is preliminarily and permanently enjoined from committing and continuing to commit the foregoing conduct, she will continue to threaten ESA's business, and ESA will suffer immediate, substantial, and irreparable harm from the aforesaid actions.

132.   Through the factual allegations contained herein, ESA has established a substantial likelihood of success on the merits, that it has no adequate remedy at law, and that the balance of equities favors entry of an injunction against Ruby.

133.   In addition to the irreparable harm described above, Ruby's breach of her duty of loyalty has caused ESA to suffer economic injuries in an amount to be proved at trial.

**COUNT V**
**VIOLATION OF THE FEDERAL COMPUTER FRAUD AND ABUSE ACT ("CFAA") –**
**ALL DEFENDANTS**

134.   ESA repeats and realleges the foregoing paragraphs as if fully set forth herein.

135.   ESA's computers are protected computers used in interstate commerce.

136.   Docteroff, knowingly, intentionally, and with intent to defraud, accessed ESA's computers either without authorization or in excess of his authorized access.  Docteroff exceeded the limited nature of his authorized access, as set forth in the MSA and numerous ESA confidentiality policies provided to Docteroff, by copying and communicating ESA information to third parties without permission.  This conduct furthered Docteroff's intended fraud.

137.   By virtue of Docteroff's intentional act of accessing ESA's computers without authorization, Docteroff has recklessly caused loss to ESA.  ESA has suffered damages and a loss of no less than $5,000, including but not limited to its costs to respond to the offense.

138.   Docteroff acted with evil motive or with reckless indifference to the rights of ESA.

139.   Docteroff's actions constitute violations of 18 U.S.C. § 1030(a).

140.   Ruby and WoodSpring conspired with Docteroff to violate the CFAA.

141.    Ruby acted within the scope of her employment with WoodSpring and in furtherance of WoodSpring's business—with WoodSpring's knowledge—and WoodSpring is liable for Ruby's conspiracy to violate the CFAA.

142.    Unless Defendants are preliminarily and permanently enjoined from committing and continuing to commit the foregoing conduct, they will continue to threaten ESA's business, and ESA will suffer immediate, substantial, and irreparable harm from the aforesaid actions.

143.    Through the factual allegations contained herein, ESA has established a substantial likelihood of success on the merits, that it has no adequate remedy at law, and that the balance of equities favors entry of an injunction against Defendants.

## COUNT VI
## VIOLATION OF THE NORTH CAROLINA COMPUTER TRESPASS STATUTE – MICHAEL DOCTEROFF

144.    ESA repeats and realleges the foregoing paragraphs as if fully set forth herein.

145.    Docteroff used ESA's computer network to take and/or disclose ESA's Trade Secrets and other electronically stored confidential and proprietary information.  This use was without authorization or exceeded the limited right and/or permission ESA granted to him.

146.    Docteroff intended to, and did, make or cause to be made an unauthorized copy of ESA's Trade Secrets and other electronically stored confidential and proprietary information.

147.    Docteroff's actions constitute a computer trespass in violation of N.C. Gen. Stat. § 14-458(a).

148.    ESA has been damaged by Docteroff's unauthorized disclosure, taking, receipt, retaining, and/or use of data from ESA's computers because it has incurred fees for the examination of certain computers and because Docteroff's actions have given Ruby and/or WoodSpring an unfair competitive advantage over ESA and have placed them in a position to

divert substantial business from ESA.  ESA has further been damaged in that it has expended attorneys' fees in connection with this matter.

149.    In taking, receiving, retaining, using, or disclosing data from ESA's computer network, and/or computer system, Docteroff's actions were performed with an evil motive or with reckless indifference to the rights of ESA.

150.    Unless Docteroff is preliminarily and permanently enjoined from committing and continuing to commit the foregoing conduct, he will continue to threaten ESA's business, and ESA will suffer, immediate, substantial, and irreparable harm from the aforesaid actions.

151.    Through the factual allegations contained herein, ESA has established a substantial likelihood of success on the merits, that it has no adequate remedy at law, and that the balance of equities favors entry of an injunction against Docteroff.

152.    In addition to the irreparable harm described above, Docteroff's actions have caused ESA economic injury in an amount to be proved at trial.

## COUNT VII
## UNFAIR TRADE PRACTICES – ALL DEFENDANTS

153.    ESA repeats and realleges the foregoing paragraphs as if fully set forth herein.

154.    Defendants committed unfair and deceptive acts or practices that violated established public policy and were immoral, unethical and unscrupulous.  These acts consisted of conspiring to misappropriate and actually misappropriating ESA's valuable trade secrets in violation of contractual and common-law confidentiality obligations and commercial norms.

155.    Defendants' actions were in or affecting commerce.

156.    Defendants' acts proximately caused injury and damages to ESA in an amount to be proved at trial.

29

157.    Through their commission of unfair and deceptive trade practices, Defendants willfully and maliciously caused injury to ESA.

## COUNT VIII
## TORTIOUS INTERFERENCE WITH CONTRACT – BERNADETTE RUBY AND WOODSPRING

158.    ESA repeats and realleges the foregoing paragraphs as if fully set forth herein.

159.    ESA is a party to the MSA, a valid and enforceable contract.

160.    Pursuant to Section 15 of the MSA, Edgewater and its employees are prohibited from copying or communicating ESA's confidential information, including its Trade Secrets, to third parties.

161.    By virtue of Ruby's former employment with ESA and her interactions with Docteroff, Ruby and WoodSpring knew or should have known of the MSA and the confidentiality obligations imposed on Edgewater and its employees.

162.    Based on Ruby's more than 26 years in the hospitality industry and WoodSpring's own participation in the extended-stay lodging industry, Ruby and WoodSpring were aware that ESA's Trade Secrets and other confidential information were highly valuable and the sort of information market participants closely guard against disclosure.  Additionally, Ruby was aware from her time working with ESA that ESA imposed significant restrictions on the access, use, and disclosure of such information.

163.    Ruby and WoodSpring intentionally induced Docteroff to cause Edgewater to breach Section 15 of the MSA by copying ESA's Trade Secrets and communicating them to Ruby and WoodSpring, thereby depriving ESA of the benefits of the MSA.

164.    Ruby and WoodSpring acted willfully, maliciously and without justification in that they were aware that their actions were unlawful and contrary to well-established and

longstanding laws prohibiting the misappropriation of trade secrets, as well as the clear terms of the MSA.

165.    Ruby and WoodSpring's actions directly and proximately caused actual damages to ESA in an amount to be proved at trial.

166.    Ruby acted within the scope of her employment with WoodSpring and in furtherance of WoodSpring's business—with WoodSpring's knowledge—and WoodSpring is liable for Ruby's act of tortiously interfering with ESA's rights under the MSA.

**COUNT IX**
**TORTIOUS INTERFERENCE WITH CONTRACT – WOODSPRING**

167.    ESA repeats and realleges the foregoing paragraphs as if fully set forth herein.

168.    ESA entered into the SAR, a valid and enforceable contract, with Ruby.

169.    Pursuant to Section 7 of the SAR, Ruby was required to return, and was prohibited from copying, information belonging to ESA pertaining to, inter alia, ESA customers and pricing information.  Pursuant to Section 8 of the SAR, Ruby is prohibited from disclosing any of ESA's confidential information, including trade secrets, pricing data, and customer data.

170.    On information and belief, WoodSpring was aware of the restrictions imposed on Ruby by Sections 7 and 8 of the SAR.

171.    Furthermore, WoodSpring was aware, based on its own participation in the extended-stay lodging industry, that ESA's Trade Secrets and other confidential information were highly valuable and the sort of information market participants closely guard against disclosure.

172.    WoodSpring intentionally induced Ruby to breach Sections 7 and 8 of the SAR by disclosing ESA's Trade Secrets and other confidential information to members of the

WoodSpring sales team and using the information to obtain an unfair competitive advantage over ESA.

173.    WoodSpring acted willfully, maliciously and without justification in that it was aware its actions were unlawful and contrary to well-established and longstanding laws prohibiting the misappropriation of trade secrets, as well as the clear terms of the SAR.

174.    WoodSpring's actions directly and proximately caused actual damages to ESA in an amount to be proved at trial.

**COUNT X**
**TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY – WOODSPRING AND BERNADETTE RUBY**

175.    ESA repeats and realleges the foregoing paragraphs as if fully set forth herein.

176.    As detailed herein, ESA has numerous business relationships with many customers.  ESA has developed these relationships through extensive effort and undertakes ongoing measures to cultivate and maintain those relationships.  ESA has an expectation that its relationship and contracts with these customers will continue, thereby conferring an economic benefit on ESA.

177.    WoodSpring and Ruby were aware of ESA's relationships with these customers. Among other things, WoodSpring and Ruby learned of ESA's relationships with these customers through their misappropriation of ESA's Trade Secrets and other confidential and proprietary information.

178.    WoodSpring and Ruby intentionally, willfully, maliciously and without justification interfered with ESA's relationships with its customers by misappropriating and using ESA's Trade Secrets and other confidential and proprietary information to unfairly compete with and divert customers from ESA.

179.    But for Defendants' unlawful and unjustified interference, ESA was reasonably certain to have continued its relationships and contracts with customers diverted to WoodSpring, thereby continuing to realize its business expectation.

180.    Defendants' willful and malicious interference with ESA's business expectancy has caused damages to ESA in an amount to be proved at trial.

**COUNT XI**
**CIVIL CONSPIRACY – ALL DEFENDANTS**

181.    ESA repeats and realleges the foregoing paragraphs as if fully set forth herein.

182.    Upon a meeting of the minds, Ruby, WoodSpring, and Docteroff conspired to misappropriate ESA's Trade Secrets and confidential and proprietary information; to misuse Docteroff's extensive knowledge of ESA's computer system; to use and disclose ESA's Trade Secrets and confidential and proprietary information; and to compete unfairly against ESA, in violation of state and federal law, Ruby's obligations under the SAR, and/or Docteroff's obligations pursuant to the MSA.

183.    Ruby committed overt acts in furtherance of the conspiracy by misappropriating ESA's Trade Secrets and other confidential and proprietary information and distributing that information to members of the WoodSpring sales team.

184.    Docteroff committed overt acts in furtherance of the conspiracy by exceeding his authorization to access ESA's computer system, making unauthorized copies of ESA's Trade Secrets and confidential and proprietary information, and disclosing that information to Ruby and/or WoodSpring.

185.    As a direct and proximate result of the foregoing events and actions undertaken by Ruby, WoodSpring and Docteroff, Defendants have caused damage to ESA in that certain of ESA's Trade Secrets and other confidential and proprietary information have been disclosed to

Ruby and/or WoodSpring, giving them an unfair competitive advantage over ESA and placing them in a position to divert substantial business from ESA.

186.   In participating in the conspiracy, Defendants' actions were performed with an evil motive or with reckless indifference to the rights of ESA.

187.   Unless Defendants are preliminarily and permanently enjoined from committing and continuing to commit the foregoing conduct, they will continue to threaten ESA's business, and ESA will suffer immediate, substantial, and irreparable harm from the aforesaid actions.

188.   Through the factual allegations contained herein, ESA has established a substantial likelihood of success on the merits, that it has no adequate remedy at law, and that the balance of equities favors the entry of an injunction against Defendants.

## REQUESTED RELIEF FOR ALL COUNTS

WHEREFORE, ESA respectfully prays for the following relief:

a.    For a Preliminary Injunction:

i.    Directing Defendants to immediately cease distributing, disclosing or making any use of any and all trade secret and other confidential information belonging to ESA that would not be known to them if it had not been misappropriated, including but not limited to the Eagle by Market.xlsx spreadsheet, and information copied, taken, or derived therefrom, and any other information relating to ESA's customers, revenue per customer, nights per customer, market data, or pricing;

ii.   Directing Defendants to take any and all necessary steps to prevent the destruction of any copies, whether physical or electronically stored, of any trade secret and other confidential information belonging to ESA that would not be known to Defendants if it had not been misappropriated, including but not limited to the Eagle by Market.xlsx spreadsheet, and any information copied, taken, or derived therefrom, that is in Defendants' possession, or the possession of their employees, agents, or subsidiaries;

iii.  Directing Defendants to identify and disclose to counsel for ESA a list of any hardware (e.g., computer, tablet, flash drive, SD card, cell phone, or other external storage device) on which any trade secret and other confidential information belonging to ESA that would not be known to

Defendants if it had not been misappropriated, including but not limited to the Eagle by market.xlsx spreadsheet, information relating to ESA's customers, revenue per customer, nights per customer, market data, pricing, and any information copied, taken, or derived therefrom, is located;

iv.   Directing Defendants Docteroff and Ruby to immediately identify and disclose to counsel for ESA a list of any and all email accounts and cloud-based storage accounts that they have used at any time between June 1, 2016 and the present, and furthering directing Docteroff and Ruby not to take any action to delete, purge or otherwise cause the destruction of any e-mails or documents stored on such account(s) absent mutual written agreement of the parties or further order of the Court;

v.   Directing Defendant WoodSpring to immediately collect from its employees any and all physical copies of trade secret and other confidential information belonging to ESA that would not be known to Defendants if it had not been misappropriated, including but not limited to the Eagle by market.xlsx spreadsheet, any information relating to ESA's customers, revenue per customer, nights per customer, market data, pricing, and any information copied, taken, or derived therefrom, and to take any and all necessary steps to ensure that its employees do not destroy or continue to make use of such information;

vi.   Directing Defendant WoodSpring to immediately take any and all actions necessary to preserve and prevent the destruction of documentation in the possession of its employees, whether physical or electronically stored, relating to Defendants' distribution, disclosure, or use of any trade secrets and other confidential information belonging to ESA or Ruby's encouragement of WoodSpring sales team members to pursue ESA customers;

vii.   Directing Defendant WoodSpring to immediately: (1) collect any and all physical copies of trade secret and other confidential information belonging to ESA that are in the possession of any WoodSpring franchisee, and (2) take any and all actions necessary to preserve and prevent the destruction of documentation in the possession of any WoodSpring franchisee, whether physical or electronically stored, relating to Defendants' distribution, disclosure, or use of any trade secrets and other confidential information belonging to ESA;

viii.   Directing Defendant Docteroff to immediately deliver to a neutral third-party expert the computer he used to remotely access ESA's computer network, and further directing that counsel shall cooperate to select a mutually acceptable neutral who shall be instructed to create a forensic image, at Docteroff's expense, of the computer and to provide a written

report of its contents (without disclosing any proprietary information), but should not allow either party to view the image(s) absent mutual written agreement of the parties or order of the Court;

ix.     Directing Defendants WoodSpring and Ruby to immediately deliver to a neutral third-party expert any computer(s) on which Ruby or any other WoodSpring employee received or accessed any trade secret and other confidential information belonging to ESA that would not be known to Defendants if it had not been misappropriated, and further directing that counsel shall cooperate to select a mutually acceptable neutral who shall be instructed to create a forensic image, at WoodSpring and Ruby's expense, of the computer(s) and to provide a written report of its contents (without disclosing any proprietary information), but should not allow either party to view the image(s) absent mutual written agreement of the parties or order of the Court;

x.      Directing Defendant WoodSpring to deliver a copy of the Court's Preliminary Injunction order to each of its directors, officers, servants, employees, agents, and franchisees; and

xi.     Directing that within 15 days of the entry of the Court's Preliminary Injunction, Defendants shall deliver to ESA any and all hard copies and copies of electronically stored ESA information in their possession, custody, or control, wherever located;

b.      For a Permanent Injunction prohibiting Defendants and any person or company acting in concert with them, including any agents, employees, or franchisees of WoodSpring or any other competitor of ESA, from using, disclosing, copying, revealing or discussing any and all trade secrets and other confidential information belonging to ESA for a period of sixty (60) months;

c.      For all actual, punitive, and other damages to which ESA is entitled as a result of Defendants' activities;

d.      For ESA's attorneys' fees and costs incurred herein;

e.      For the costs of this action, and pre- and post-judgment interest; and

f.      For all other such relief the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues stated herein, and all issues so triable.

Respectfully submitted,

/s/ Katherine E.M. Chlumsky
Ross A. Hollander, #09010
Katherine E.M. Chlumsky, #26816
JOSEPH HOLLANDER & CRAFT LLC
500 North Market Street
Wichita, Kansas 67214
Telephone: (316) 262-9393
Facsimile:  (316) 262-9006
Email: rhollander@josephhollander.com
        kchlumsky@josephhollander.com


Lynn Hursh, KS Bar No. 10191
J. Kent Lowry (*pro hac vice pending*), MO #26564
Jeffrey L. Schultz (*pro hac vice pending*),
        MO #56553
Alexander C. Barrett (*pro hac vice pending*),
        MO #68695
ARMSTRONG TEASDALE LLP
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
Telephone: (314) 621-5070
Facsimile:  (314) 621-5065
Email: lhursh@armstrongteasdale.com
        klowry@armstrongteasdale.com
        jschultz@armstrongteasdale.com
        abarrett@armstrongteasdale.com

ATTORNEYS FOR PLAINTIFFS EXTENDED
STAY AMERICA, INC. AND ESA
MANAGEMENT LLC